LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
(415) 981-7210

SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
JOSEPH NICHOLSON (State Bar #284959)
jnicholson@walkuplawoffice.com
**ATTORNEYS FOR PLAINTIFF**

Marlene J. Goldenberg (*pro hac vice pending*)
**GOLDENBERGLAW, PLLC**
800 LaSalle Avenue
Suite 2150
Minneapolis, MN 55402
Phone: (612) 333-4662

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>　　　　　Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Jane Doe, by and through undersigned counsel Walkup, Melodia, Kelly & Schoenberger, A Professional Corporation, as her Complaint against Defendant Uber Technologies, Inc. ("Uber," the "Company" or "Defendant"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.　　　This action arises out of an incident that occurred on August 5, 2016, in Hennepin County, Minnesota. On that evening, Plaintiff Jane Doe was falsely imprisoned and then sexually assaulted and battered by an Uber driver named Abdel Jaquez aka Abdel Jaquel (hereafter "Jaquez").

2.      Plaintiff alleges that Defendant Uber, as a transportation company and common carrier, is directly liable for its negligent hiring, supervision, and retention of Jaquez, directly liable for its advertising misrepresentations holding out its transportation service as a safer alternative to taxis for women like Ms. Doe, and vicariously liable for Jaquez' tortious conduct against Ms. Doe.

3.      Since its inception in 2010, Uber has grown rapidly into a multi-billion dollar enterprise with operations worldwide. Uber's phenomenal growth is due in large part to its lax hiring and security screening processes and evasion of regulations. At the same time, Uber has fraudulently marketed itself as a safer, better alternative to other methods of transportation, particularly targeting young women and intoxicated, late-night riders.

4.      Uber's conduct evidences a conscious attitude and corporate policy of "profits over people" characterized by a willful and knowing disregard of the rights and safety of others so base and contemptible as to be looked down on and despised by reasonable people.

## PARTIES

5.      Plaintiff Jane Doe is an adult woman who is a citizen of Minnesota and currently resides in Roseville, Minnesota, a suburb adjacent to both Minneapolis and Saint Paul.

6.      Defendant Uber Technologies, Inc. is a Delaware Corporation with its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California 94103.  Uber operates throughout the United States and internationally in approximately 555 cities including Minneapolis and Saint Paul.

## JURISDICTION AND VENUE

7.      The jurisdiction of this action arises under diversity of citizenship pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of Minnesota.  Defendant Uber Technologies, Inc. is a citizen of California.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      The Court has personal jurisdiction over Defendant Uber Technologies, Inc. because it is headquartered in San Francisco, California and it conducts business in California.

9.      Venue is proper as authorized pursuant to 28 U.S.C. § 1391(b)(1), as Defendant Uber Technologies Inc. is headquartered in, conducts business in, and resides in this district.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

## GENERAL ALLEGATIONS

## I.      DEFENDANT UBER TECHNOLOGIES, INC.

### A.      Background

10.      Defendant Uber Technologies, Inc. (hereafter "Uber") is a popular and rapidly expanding "transportation network company" whose digital smartphone application (hereafter "App") allows people to order and pay for taxi rides through their phones. Since starting in San Francisco in June 2010, Uber has grown to operate in approximately 555 cities worldwide. The Company reported having over 160,000 regularly active drivers by the end of 2014. In October 2016, Uber's CEO indicated that the company provides its services to over 40 million active riders monthly. A stock offering that year valued the Company at over $60 billion.

11.      Uber connects drivers and riders through a downloadable App called "Uber." Individuals who have downloaded the App use it to make a transportation request. Uber matches the rider with an Uber driver who, also signed into the Uber App, picks up the rider and drives them to a destination. Uber chooses what information to provide to the drivers and when to provide it. Uber typically does not disclose the rider's destination until the ride begins. App users must pay Uber for the ride with a credit card authorized through the App. Uber establishes the rate for a given ride (rates are variable depending on demand levels, promotional deals, and other factors), collects the fare, pays the driver a share of the fare collected, and retains the remainder. Uber drivers typically remain unaware of the total amount Uber collects for a particular ride.

12.      To provide rides quickly and efficiently, Uber's business model requires a large pool of drivers. To accomplish this, Uber solicits and retains tens of thousands of non-professional drivers. Uber markets to potential drivers on its website, where it states: "Uber needs a partner like you. Driver with Uber and earn great money…Get paid weekly just for helping your community of riders get rides around town." After these drivers are hired by Uber, Uber makes the drivers available to the public to provide transportation services through its App.

13.      In 2016, Uber provided more rides in the Twin Cities of Minneapolis/St. Paul than traditional taxis did.

/ / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

3
COMPLAINT - CASE NO.

### B.     Uber Is a Common Carrier

14.     Uber offers to carry and transport members of the general public, and holds itself out to the public generally and indifferently to provide such services for profit.

15.     Uber messaging and advertisements, from 2011 to 2014, contained the statement: "Uber: Everyone's Private Driver." Thus Uber communicates that it is a prestigious transportation company providing rides to all members of the public.

16.     As of June of 2016, Uber had provided two billion rides to members of the public. Because of Uber's expansion, one billion of those rides had occurred in the first six months of 2016.

17.     In 2016, Uber began offering rides in driverless cars in Pittsburgh and then San Francisco. These computer-driven cars use the same dispatch service, same rate structure, and same platform as used by the human-driven cars.

18.     Uber is available to the general public through the App available for anyone to download to a smartphone.

19.     Uber policy prohibits drivers from refusing to provide services based on the rider's destination. By its own admission, "Uber provides safe, affordable rides around the clock— regardless of where you live, where you're going, or what you look like."

20.     By its own admission, "Uber complements existing transit systems," and provides rides to "parts of cities where taxis don't go."

21.     Neither drivers nor riders are charged a fee to download the Uber App. Uber's sole source of revenue is from charges to riders for trips taken.

22.     Uber charges customers standardized fees for car rides, setting its fare prices without driver input. Drivers may not negotiate fares.

23.     In 2015, Uber's CEO stated that in San Francisco alone, its most mature market, the Company's revenue was three times larger than that of the local taxi market, in excess of $500 million per year.

24.     By its own admission, Uber wants to be available for "everyone."

25.     Uber requires drivers to accept all ride requests when logged into its App or else

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

4
COMPLAINT - CASE NO.

face potential discipline.

26.     Uber policy prohibits drivers from refusing to provide services based on race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or any other characteristic protected under relevant federal, state or local law.

27.     Uber expects its drivers to comply with all relevant state, federal and local laws governing the transportation of riders with disabilities, including transporting service animals. Uber specially instructs its drivers on accessibility for riders with disabilities.

### C.     Uber Employs Tens of Thousands of Drivers Who Lack Specialized Skills

28.     Uber's business model depends on having a large pool of non-professional drivers.

29.     There are no specialized skills needed to drive for Uber. By its own admission, "anybody" can drive for Uber if they meet the minimum requirements of being over 21 years of age with a valid U.S. driver license, at least one year of driving experience in the U.S., and an eligible four-door vehicle. Uber does not charge a fee for driver applications.

30.     By its own admission, jurisdictions that have strict regulations on driver qualifications make it difficult for Uber to hire enough drivers.

31.     Uber controls its drivers' contacts with its customer base and considers its customer list to be proprietary information.

32.     Uber does not charge drivers a fee to receive notifications of ride requests mediated through the Uber App.

33.     Uber's fare prices for rides are set exclusively by the Company and its executives. Drivers have no input on fares charged to customers. Drivers are not permitted to negotiate with customers on fares charged. Uber retains the right and the ability to adjust charges to riders if the Company determines that a driver took a circuitous route to a destination.

34.     Uber processes the fare for each ride. It does not give the drivers information about the amount of the fare charged to the riders. Uber then pays the drivers directly.

35.     Uber provides auto insurance for drivers that do not maintain sufficient insurance on their own. Insurance provided by Uber covers incidents occurring while a driver is connected online with the Uber App, with coverage increasing when a rider is in the vehicle.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

5
COMPLAINT - CASE NO.

36.     Uber provides its drivers with logo stickers for their windshield and rear window and trains them that these stickers must be displayed in compliance with Minneapolis Code of Ordinances 343.100.

37.     Uber attempts to impose uniformity in the conduct of its drivers. Uber policy mandates that all drivers:

    a.  Dress professionally;

    b.  Send the customers requesting rides a test message when the driver is 1-2 minutes away from the pickup location;

    c.  Keep the radio either off or on "soft jazz or NPR;"

    d.  Open the door for riders;

    e.  Pick up customers on the correct side of the street where the customer is standing; and

    f.  In some cities, Uber requires drivers to display an Uber sign in the windshield.

    g.  Uber encourages drivers to offer breath mints and water to riders.

38.     Uber retains a fee of approximately 20-30% of every ride charged to a customer.

39.     Uber retains the right to terminate drivers at will, with or without cause. Drivers who reject too many ride requests risk facing discipline including suspension or termination. Uber also uses rider feedback to discipline or terminate drivers.

40.     Uber processes and deals with customer complaints regarding drivers, and maintains the driver rating system used by customers.

41.     In some locations, Uber rewards active drivers that maintain a high acceptance rate for ride requests, total number of hours online, total number of completed trips, and customer rating by providing a "gross fare guarantee" that sets a specific hourly pay that drivers receive, tantamount to a wage.

42.     Uber at times also incentivizes drivers to remain employees by paying a minimum rate of $10-26 to log into the App, accept 90% of ride requests, complete one trip per hour, and be online 50 out of 60 minutes. The result of such incentive programs is that drivers are guaranteed a minimum amount of pay from Uber regardless of actual work performed, tantamount to a salary.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

6
COMPLAINT - CASE NO.

**D.     Systemic Deficiencies in Uber's Employment and Supervision of its Drivers**

43.     In order to become a driver for Uber, individuals apply through Uber's website. The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance. Uber does not verify that the documents submitted are accurate or actually pertain to the applicant.

44.     Uber does not verify vehicle ownership. Rather, it only requires that the vehicle is registered and is not more than ten years old.

45.     Neither Uber nor its third party vendors require driver applicants to attend training classes on driving skills or using mobile Apps while driving.

46.     Neither Uber nor its third party vendors require driver applicants to pass road vehicle tests or vision and hearing exams.

47.     Uber is and has been aware that its security screening processes are insufficient to prevent incompetent and unsafe applicants from successfully registering as Uber drivers.

48.     Uber lobbies state and local governments, including in Minneapolis and St. Paul, to limit regulations, including allowing Uber to conduct its own background checks of driver applicants instead of having municipalities perform the more stringent security screening applied to traditional taxi drivers. Uber has successfully persuaded lawmakers in several states, including Minnesota and California, to keep background check requirements for its drivers limited.

49.     As a direct result of Uber's lobbying efforts, the Company largely self-enforces hiring standards for its drivers in the Minneapolis/St. Paul area. Where cities perform their own screening, such as Houston, Texas, hundreds of driver applicants approved by Uber are ultimately rejected.

50.     Even where authorized to do so, however, Uber does not perform its own background checks. Rather, Uber generally outsources background checks of driver applicants to third party vendors that do not perform stringent background checks. The background checks run potential drivers' social security numbers through databases similar to those held by private credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions. The background checks conducted by private companies for Uber do not require

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

7
COMPLAINT - CASE NO.

fingerprinting for comparison against Department of Justice and Federal Bureau of Investigation databases. Neither Uber nor the third party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for an Uber background check is often under 36 hours.

51.     The application process to become an Uber driver is simple, fast, and designed to allow the Company to hire as many drivers as possible while incurring minimal associated costs. Such cost saving, however, is at the expense of riders, especially female riders. Specifically, at no time during the application process does Uber or its third party background check vendor, acting on Uber's behalf, do any of the following:

      a.   Conduct Live Scan biometric fingerprint background checks of applicants;

      b.   Conduct in-person interview of applicants;

      c.   Verify vehicle ownership;

      d.   Conduct physical vehicle inspections;

      e.   Verify that social security numbers and other personal identification numbers submitted in the application process in fact belong to the applicants;

      f.   Require applicants to attend training classes on driving skills;

      g.   Require applicants to attend training classes to prevent, harassment, including sexual harassment of customers;

      h.   Require applicants to attend training classes to hone skills needed to safety use mobile Apps while driving;

      i.   Require applicants to pass written examinations beyond basic "city knowledge" tests;

      j.   Require applicants to pass road vehicle tests; and

      k.   Require applicants to pass vision and hearing exams.

52.     In 2015 the District Attorney of San Francisco and the District Attorney of Los Angeles filed a complaint alleging that individuals who passed Uber's security screening process and were found driving for Uber had the following felony convictions: second degree murder; lewd and lascivious acts against a child under the age of 14; sexual exploitation of children;

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

kidnapping for ransom with a firearm; assault with a firearm; grand theft; robber; identity theft; burglary; and taking a vehicle without consent. In connection with the litigation, the San Francisco District Attorney called background checks without fingerprinting "completely worthless."

53.     As a result of Uber's deficient security screening, drivers who have been arrested, charged, and/or convicted violent crimes, theft, armed robbery, DWI, driving with a suspended license, and multiple moving violations successfully register as Uber driver and can and do get matched with Uber ride requests through the Uber App, exposing riders to dangerous and potentially violent situations without their knowledge.

54.     In St. Paul, Minneapolis, some Uber drivers have been found to be driving without a license.

55.     Uber does not verify that the individual operating a vehicle is the individual registered as an Uber driver. Thus, even if applicants do not pass the Uber security screening process, it is still possible for such individuals to pick up Uber customers as ostensible Uber drivers.

56.     Uber does nothing to ensure that its drivers are not intoxicated or under the influence of drugs or medication while providing transportation for Uber customers.

57.     Uber does not limit the number of hours per day that a driver can be logged into its App, thus creating a risk that drivers will continue accepting riders for extended periods, long after ordinary fatigue and exhaustion makes it dangerous to riders and the public for them to continue driving.

58.     Uber does not verify whether its drivers are armed or concealing any weapons when they pick up Uber customers.

59.     Uber riders do not simply get into cars with strangers. Because of Uber's deficient security screening, its customers truly have no idea with whom they are riding.

60.     Concerns about the threats Uber drivers pose to their riders are not merely hypothetical, and this is well known to Uber and its executives. In the years 2015 and 2016 alone, dozens of crimes committed by Uber drivers against their riders were reported, ranging from theft to sexual assault, kidnapping, and rape. Uber drivers have also been reported driving drunk.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

9
COMPLAINT - CASE NO.

61.     Uber has placed profits over safety by deliberately lowering the bar for drivers in order to rapidly expand its network of drivers and thus its profits. This is a calculated decision by senior executives to allow Uber to dominate the emerging rideshare market at the expense of public safety.

62.     Uber has accomplished its aggressive expansion by entering inviting people without skills or experience to become Uber drivers, flouting licensing laws and vehicle safety and consumer protection regulations, implementing lax hiring standards, and making it as easy as possible for anyone to become and remain a driver.

63.     Consistent with its policy of putting profits before public safety, Uber deliberately focuses its hiring and retention efforts on branding and appearances, encouraging clean dress, and encouraging drivers to offer water and mints to customers, while simultaneously avoiding rigorous background checks and other efforts aimed at safety.

**E.      Uber Fraudulently Markets Itself as a Safer, Better Alternative to Taxis**

64.     Nevertheless, Uber has misled and continues to knowingly mislead the public about the safety and security measures it employs to protect its rider customers. Despite the known deficiencies in Uber's security screening processes, Uber holds itself out to the public as "safe." Rather than inform riders of its security failures or correct the flaws, Uber presents itself to customers as "a ride you can trust."

65.     Uber has misrepresented to its customers on its website that:

> Wherever you are around the world, Uber is committed to connecting you to **the safest ride on the road**. That means setting the **strictest standards possible**, and then working hard to improve them every day. The specifics vary depending what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – what we are doing in the US is an example of our standards around the world. [emphasis added]

66.     Uber has misrepresented to its customers on its website that:

> "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind."

67.     Uber has actively fostered and successfully cultivated an image among its

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

customers of safety and superiority to public transportation and traditional taxis – which is reflected in the very name of the Company itself.

68.    Uber advertises that it is a safe transportation option for children, and offers them the "Safest rides on the road."



69.    Uber markets itself to users with the "hashtag" #LiveBetter.

70.    Uber claims to "focus on rider safety before during and after every trip" when in fact, in addition to the gaps in its security screening, Uber does not monitor most individual rides in real time and does not ensure that the driver picking up an Uber customer is the registered Uber driver.

71.    Until as recently as October 2014, Uber represented that "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three step criminal background screening for the U.S. – with country, federal and multi-state checks that go back as far as the law allows –and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

72.    Uber charges riders a $1-1.50 fee per ride, which from 2013 to 2015 it described to them as a "safe ride" fee used to provide "industry leading" background checks and other safety measures. In 2016, Uber agreed to pay $28.5 million to settle a class action lawsuit over its fraudulent marketing of its security screening as "industry-leading."

73.    Uber has not taken steps to correct its public image of safety. Instead,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

11
COMPLAINT - CASE NO.

because of Uber's ongoing aggressive marketing, most Uber customers are generally unaware of the real risks represented by Uber's own drivers, and continue to believe a ride with Uber is a safer and better alternative.

74.     Though, in certain circumstances, an Uber ride can be less expensive than a traditional taxi, Uber rides are often more expensive. This is true in part because of a practice called "surge pricing," in which Uber unilaterally increases its fees by a multiplier based on demand conditions. While intended to ensure that rides go to those who need them most, in effect surge pricing ensures that rides during peak hours go to those willing to pay the most. The overall effect is to contribute to Uber's connotation with cachet.

75.     Riders, such as plaintiff, reasonably rely on Uber's representations and promises about its safety and security measures including driver screening and background check procedures. Uber's riders choose to utilize Uber's service as a result of this reliance.

**F.      Uber's Marketing Targets Intoxicated Female Riders**

76.     As part of marketing itself as a better, safer alternative, Uber particularly targets the market of intoxicated, late night riders, especially women. By its own admission, Uber's "rush hour starts just after last call at bars."



77.     In 2015, Uber released a report with Mothers Against Drunk Driving ("MADD") that states "The Uber app was created to ensure reliable access to safe rides." The report goes on to state that, with Uber, intoxicated persons can find "a safe, reliable ride home" that is "always within reach."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

12
COMPLAINT - CASE NO.

78.     Uber does not inform its riders that hailing a ride after drinking also puts those same riders at peril from the Uber drivers themselves. The safe and stylish image Uber aggressively cultivates suggests to its customers that riding while intoxicated with Uber is safer than doing the same with a traditional taxi. By marketing heavily to young women who have been drinking, while claiming that rider safety is its top priority, Uber is actually putting its female customers at grave risk.

79.     Uber particularly markets itself as a safer transportation alternative for women. Uber's website and marketing contains numerous pictures of smiling women entering and exiting vehicles, who are meant to appear "safe."



RIDE  ›  SAFETY

Trip safety
Our commitment to riders

Uber is dedicated to keeping people safe on the road. Our technology enables us to focus on rider safety before, during, and after every trip.



LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

80.     Uber knew that its representations and promises about rider safety were false and misleading, yet continued to allow its riders to believe in the truth of its representations and promises, and to profit from its riders' reliance on such representations and promises.

**G.     Uber Knew Its Representations About Safety Were False, and Knew that Its Hiring Processes Were Deficient**

81.     Sexual assaults by Uber drivers against passengers are not isolated or rare occurrences. They are part of a pattern of heinous, but avoidable, attacks.

82.     Upon information and belief, over thirty different sexual assaults by Uber drivers against Uber passengers have been reported in the media in the last two years alone.  On information and belief, due to general underreporting of sexual crimes, these media-reported assaults represent only a small fracture of the number of actual sexual assaults that are perpetrated by Uber drivers against riders.

**II.     JANE DOE**

83.     Jane Doe resides in Roseville, Minnesota.

84.     Ms. Doe began using Uber on occasion in approximately 2013, after becoming persuaded that Uber was a safe, high-quality car service. She gained this impression from Uber advertising, and from her experience taking Uber rides with friends who already had the Uber App. She rode in cars decorated with Uber logos and trade dress, and was impressed by the deliberate appearance, which Uber had cultivated, that these were high-end, clean cars, driven by professional Uber drivers.

85.     From 2013 through 2016, Ms. Doe saw numerous Uber advertisements representing that Uber offered safer and cleaner rides than taxis provided, and that it was a safe and reliable option for female passengers. She saw these advertisements, including the advertisements described hereinabove (or advertisements very similar to them). She was exposed to this advertising in a variety of ways, including through Uber's emails to her, and via advertisements on her home page that would pop up in the mornings at work.

86.     Ms. Doe and her female friends relied on Uber's advertisements regarding safety, professionalism, and reliability in choosing to ride with Uber on a repeat basis.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

87.     On the evening of August 5, 2016, Ms. Doe was with two of her friends, one of whom hailed a ride through the Uber App. At approximately 8:55 p.m. Uber driver Jaquez picked up Ms. Doe and her friends. They saw Uber logo stickers on his vehicle. Jaquez was well dressed and his car was clean. They got into his vehicle based on their understanding that he was a professional driver, that he was an Uber employee acting on Uber's behalf, and that he was vetted by Uber and held to what they believed were Uber's high standards of safety and professionalism.

88.     Unbeknownst to Ms. Doe and her friends, Jaquez had a record of moving violations.  On information and belief, he also had a prior criminal record of a sexual crime against another woman, which would have been revealed by a detailed fingerprint-based background check of the type conducted regularly within the taxi industry.

89.     Jaquez transported Ms. Doe and her friends to their destination at a brewery in Minneapolis, Minnesota. During the fourteen-minute drive, Jaquez and all three women engaged in friendly and flirtatious conversation. At the conclusion of this ride, Jaquez exchanged phone numbers with Ms. Doe and her friends so that, when they were ready to leave the brewery, they could take an Uber ride to their next destination.

90.     When Ms. Doe and her friends were finished eating and drinking at the brewery, they contacted Jaquez and requested transport to a second bar, also in Minneapolis, Minnesota. Ms. Doe and one friend rode with Jaquez to the second bar. It was their understanding that Uber was continuing to charge them for this second ride via the Uber App. It was also their understanding that Jaquez continued to act as an Uber employee, on the clock, and that his status during the second ride was no different than it had been during the first ride.

91.     During this second ride, Ms. Doe was in the front passenger seat, and was playing music via the vehicle's auxiliary cord. Again, Ms. Doe and her friend engaged in friendly and flirtatious conversation with Jaquez. As Ms. Doe and her friend were exiting the car, Ms. Doe realized she had left her phone plugged into the Uber car. She let her friend enter the bar ahead of her while she retrieved her phone.

92.     When Ms. Doe was alone with him, driver Jaquez complimented and attempted to kiss her. She explained to him that she was not interested. He responded "shut the [profanity]

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT - CASE NO.

door" and hit the gas, driving forward with Ms. Doe partially in the car. Jaquez drove to the end of the block, then pulled over in an isolated and dark stretch of roadway. He climbed on top of Ms. Doe, forcibly kissing and groping her. Ms. Doe was terrified and shocked. She kept repeating: "Please let me go. I don't want to do this." Jaquez attempted to remove her clothing, tearing a button off her shirt. He gained access to and assaulted her breasts. He attempted to undress her further, but discovered that she was wearing a body-suit style shirt that made it difficult to do so.

93.    Ms. Doe managed to wrench herself away from Jaquez' grip. She exited the car, and ran in high heels to the bar where her friends were. She immediately told them that the Uber driver had attempted to rape her.

94.    While thinking she was taking the "safest ride on the road," in reality Plaintiff Jane Doe was subjected to harrowing and traumatic sexual violence at the hands of her Uber driver.

95.    Ms. Doe had visible bite marks to her lip, scratches and bruising to her arm, and a button missing from her shirt after the incident.

96.    Since the incident, Ms. Doe has been treating with a therapist for anxiety, depression, feelings of guilt, and suicidal ideation resulting from the sexual assault.

97.    Ms. Doe reported Jaquez' sexual assault to the police, and also to Uber.  Despite this report, on information and belief, Jaquez remains an authorized Uber driver to the present time.

### III.    UBER'S TERMS & CONDITIONS ARE NOT BINDING ON PLAINTIFF.

98.    When a prospective customer downloads the Uber App to her phone, she is directed to a screen promising "Safe, reliable rides in minutes." The registration process can be completed without opening or viewing the Terms and Conditions.

99.    At no point in time did Ms. Doe assent to or agree to the Terms and Conditions to the Uber App.

100.    At no point did the App require that she view the Terms and Conditions.

101.    At no point did the App require that she open an electronic link to the Terms and Conditions, nor did the App make it appear that there was a link she could follow to read the Terms and Conditions.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

17
COMPLAINT - CASE NO.

102. At no point was Ms. Doe asked to affirm that she had read the Terms and Conditions.

103. The full Terms and Conditions were never mailed, emailed, or otherwise provided to Ms. Doe.

104. The Terms and Conditions are deliberately hidden, and extraordinarily difficult to access, navigate, and read should a rider wish to find them.

105. Uber claims that it retains the exclusive right to unilaterally change the Terms and Conditions. It includes a provision in its Terms and Conditions that contractual changes are effective once posted on its website.

106. Ms. Doe was not provided conspicuous notice of the existence of applicable contract terms when she downloaded the App.

107. Ms. Doe was not required to, nor did she, review any applicable contract terms.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE, NEGLIGENT HIRING, NEGLIGENT SUPERVISION, AND NEGLIGENT RETENTION)

108. Plaintiffs allege and reassert all of the preceding paragraphs as if fully set forth herein.

109. Uber owed Plaintiff and the general public a duty of reasonable care in the hiring, training, and supervision of its drivers.

110. Uber breached that duty of care in the hiring, retention, and/or supervision of Jaquez.

111. Jaquez was unfit and incompetent to perform the work for which he was hired.

112. Uber knew or should have known at that Jaquez was unfit and incompetent and that this unfitness and incompetence created a particular risk to others.

113. Jaquez's unfitness and incompetence harmed Plaintiff and Uber's negligence in hiring, supervising, and retaining Jaquez was a substantial factor in causing that harm.

114. Uber's negligence in hiring, supervising, and retaining Jaquez was perpetrated with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others including Plaintiff, such as to warrant the imposition of punitive damages pursuant to California

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

18
COMPLAINT - CASE NO.

1   Civil Code section 3294.

2   **SECOND CAUSE OF ACTION**
    **(FRAUD, INTENTIONAL MISREPRESENTATION, CONCEALMENT, FALSE**
3   **PROMISE)**

4   115.   Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth

5   herein.

6   116.   Uber made false representations and false promises that harmed Plaintiff Jane Doe.

7   117.   Uber falsely represented to Jane Doe that it provided a safe alternative to driving at

8   night after drinking. Uber represented that its drivers were properly screened and were safe. Uber

9   promised that it was better and safer than a taxi or public transit. Uber promised Jane Doe the

10  safest ride possible.

11  118.   Uber falsely represented to Jane Doe that its rides were safe and that its drivers

12  were safe.

13  119.   Uber knew these representations were false and intended on customers like Jane

14  Doe to rely on them.

15  120.   Uber knew that its security screening was deficient, that its background checks

16  were below industry standards, and that its drivers were not trained or supervised, or given sexual

17  harassment and abuse standards. Uber knew that numerous women had been assaulted by Uber

18  drivers. Uber knew that it was not safe for intoxicated women to get into cars with its drivers.

19  Uber intentionally concealed these facts, and deliberately represented the opposite – that its drivers

20  offered the safest options for solo, intoxicated women seeking late night transportation.

21  121.   Jane Doe reasonably relied on Uber's misrepresentations in riding with Jacquel,

22  and her reliance on Uber's misrepresentations were a substantial factor in causing her harm. If

23  Jane Doe had known the facts Uber concealed about its service, its security screening, and its

24  drivers, she would not have accepted a ride with Jaquez. Uber failed to provide Jane Doe with a

25  safe ride.

26
27  **THIRD CAUSE OF ACTION**
    **(NEGLIGENT MISREPRESENTATION)**

28  122.   Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1   herein.

2       123.    Uber had no reasonable grounds for believing the false representations it made to

3   Jane Doe regarding safety and reliability of its service were true. Nevertheless, Uber intended that

4   customers including Jane Doe rely on its representations in choosing Uber over other

5   transportation services and options.

6       124.    Jane Doe reasonably relied on Uber's misrepresentations in riding with Jaquez, and

7   her reliance on Uber's misrepresentations were a substantial factor in causing her harm. If Jane

8   Doe had known the facts Uber concealed about its service, its security screening, and its drivers,

9   she would not have accepted a ride with Jaquez. Uber failed to provide Jane Doe with a safe ride.

### FOURTH CAUSE OF ACTION
#### (BATTERY)

12       125.    Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth

13   herein.

14       126.    On or about August 5, 2016, Jaquez was acting as an employee of Uber, within the

15   course and scope of that employment. As described hereinabove, Uber controlled all details of his

16   work. In fact, as demonstrated by Uber's roll-out of "driverless" (computer-driven) cars, Jaquez'

17   role in Uber's transportation company was interchangeable with a robot. Uber controlled all facets

18   of payment, payment processing, rate-setting, customer communications, feedback, branding,

19   advertising, logos, and uniformity among drivers. Jaquez' work did not require specialized skill.

20   He could be terminated at any time, on Uber's terms.

21       127.    On or about August 5, 2016, Jaquez was also Uber's apparent agent. Uber had

22   intentionally created the impression that Jaquez was its agent – via its advertising, its app that

23   assigned Plaintiff to an Uber driver, and via the logos on Jaquez' vehicle. Uber knew that Plaintiff

24   and other members of the public would not simply accept rides from strangers, but were only

25   willing to accept rides from drivers employed and vetted by Uber.

26       128.    Uber is liable for the actions of its agents and employees directly and under the

27   doctrine of *respondeat superior*. Uber is a common carrier who must carry passengers safely. As a

28   common carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

torts, whether or not such acts were committed within the scope of employment. Common carriers must use the highest care and vigilance of a very cautious person. They must all do that human care, vigilance and foresight reasonable can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business. Uber breached its duty of care in its actions towards Plaintiff.

129.    Ms. Doe reasonably believed that Jaquez was Uber's agent, acting on Uber's behalf at all times during their interactions.  In reliance on this belief, she accepted two rides from Jaquez, resulting in her injuries.

130.    The violent acts, including sexual touching, that Jaquez committed against Plaintiff incidental to and while he was performing his job duties, amounted to a series of harmful and offensive contacts and touchings of Plaintiff's person, all of which occurred intentionally without Plaintiff's consent.

131.    Jaquez touched Plaintiff with the intent to harm or offend her in violation of her reasonable personal dignity.

132.    Plaintiff did not consent to the touching.

133.    Plaintiff was harmed and offended by Jaquez' conduct and any reasonable person in Plaintiff's situation would have been offended by that conduct.

134.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

135.    As a direct and proximate result of the aforementioned, Plaintiff has incurred economic damages, including past and future therapy and medication expenses.

## FIFTH CAUSE OF ACTION
### (ASSAULT)

136.    Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

21
COMPLAINT - CASE NO.

137.    The violent acts, including sexual assaults, that Jaquez committed against Plaintiff incidental to and while he was performing his job duties, amounted to a series of events creating a reasonable apprehension in Plaintiff of immediate harmful and offensive contact to her person in violation of her reasonable sense of personal dignity, all of which was done intentionally and without Plaintiff's consent.

138.    Jaquez acted, intending to cause harmful and offensive contact, such that Plaintiff reasonably believed that she was about to be touched in a harmful and offensive manner.

139.    Jaquez threatened to touch Plaintiff in a harmful and offensive manner such that it reasonably appeared to Plaintiff that Jaquez was about to carry out the threat.

140.    Plaintiff did not consent to Jaquez conduct.

141.    Plaintiff was harmed and Jaquez' conduct was a substantial factor in causing that harm.

142.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain the damages set forth hereinabove.

## SIXTH CAUSE OF ACTION
### (FALSE IMPRISONMENT)

143.    Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

144.    Defendant's employee, Jaquez, incidental to and while carrying out his job duties and other acts authorized by Uber, refused to let Plaintiff exit his car. As a result, Plaintiff was confined in his car against her will for a significant period of time.

145.    Jaquez intentionally deprived Plaintiff of her freedom of movement by use of physical barriers, force, threats of force, and menace.

146.    The confinement compelled Plaintiff to stay in the car for some appreciable time against her will and without her consent.

147.    The confinement compelled Plaintiff to stay in the car and to therefore be conveyed elsewhere for some appreciable time against her will and without her consent.

148.    Plaintiff was harmed by Jaquez' conduct.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

22
COMPLAINT - CASE NO.

149.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain the damages set forth hereinabove.

## SEVENTH CAUSE OF ACTION
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

150.    Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

151.    Defendant's employee, Jaquez, incidental to and while carrying out his job duties and other acts authorized by Uber, confined Plaintiff in his car against her will and then sexually attacked her without her consent. Jaquez' conduct toward Plaintiff was so extreme and outrageous as to exceed the bounds of decency in a civilized society.

152.    Jaquez abused a position of physical and apparent power, where he had Plaintiff at his mercy in his car, to torment her.

153.    Jaquez knew his conduct was likely to result in harm and mental distress.

154.    Jaquez intended to and did intentionally or recklessly cause Plaintiff to suffer severe emotional distress.

155.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

156.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## PRAYER FOR RELIEF

A.    For noneconomic damages according to proof at trial;

B    For economic damages according to proof at trial;

C.    For costs of suit and attorneys' fees to the fullest extent permitted by law;

D.    For pre-judgment and post-judgment interest according to law;

E.    For punitive and exemplary damages;

/ / /

F.    For such other and further relief as the Court may deem proper.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

23
COMPLAINT - CASE NO.

1   Dated:  February 23, 2017                 WALKUP, MELODIA, KELLY & SCHOENBERGER

2

3                                                 _/s/ Sara M. Peters_____

4                                                SARA M. PETERS
                                                JOSEPH NICHOLSON
5                                                Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT - CASE NO.

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2

Plaintiff hereby demands a trial by jury on all issues so triable.

3

4   Dated:  February 23, 2017                    WALKUP, MELODIA, KELLY & SCHOENBERGER

5

6

                                            */s/ Sara M. Peters*
7                                            SARA M. PETERS
                                            JOSEPH NICHOLSON
8                                            Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

25
COMPLAINT - CASE NO.